Good morning, Your Honors. Janine Manhattan with the Law Office of Daryl Palmer. It's sort of tough to be the last case on the calendar, isn't it? You listen through everybody else, isn't it? I'm just going to talk about cereal, Your Honors. Great. All right. I'm sorry. They get us hungry. I'm with the Law Office of Daryl Palmer for appellants. I'd like to talk about the harm alleged in this complaint, wherein they advertised to parents and to children that their frosted mini-wheats would improve students' attention by a whopping 20%. And you've got your population out there. Who's going to bite that? And it turns out those facts didn't really bear out. So short of being despicable, it was at least naughty and deserved to be taken to task. And so they did, and the case is settled, and that's why we're here. I believe the settlement, after you dissect it, is probably unfair. And at the very least, the fees are dramatically over-multiplied. We'll start with the relief to the class. Kellogg's says it's going to donate $5.5 million in in-kind food to adult charities feeding adults who can't eat. I think this is very inconsistent with the purposes for which the lawsuit was filed and that they duped children and the parents of children who eat frosted mini-wheats. If you look at the cereals that they're offering to make up for this harm, they're offering Mueslix, low-fat granola, and Fiber Plus. That raises a real red flag when you think about Cypre, which is supposed to be the next best benefit to the class that was harmed. Now, I'm not here to fix the settlement, but just off the top of my head, it occurs to me perhaps serving school breakfast programs in neighborhoods which are dramatically underfunded would serve the class a lot better than serving low-fiber, high-fiber cereal to adults who haven't eaten. So you'd ask us to look at the six Mexican workers in the Nashian case and say, if we use that language, this settlement doesn't come close to serving that purpose. Absolutely. But then the remedy is you go back to district court and identify a different beneficiary. Like I said, I'm not here to rewrite the settlement, but it has some real obvious flaws. And if we do that, then what happens to the rest of the case? If we were to agree with you that the Cypre aspect needed a reexamination by the district court. It needs to go back to mediation. But I mean, what happens to the rest of your case? Does that smooth it or does it stay it? If the settlement's unfair, it needs to be redone. And what would we do, vacate the attorney's fees or leave them in place? I'll discuss the attorney's fees in just a moment. I'd like to talk about what Kellogg's does as a corporation on an annual basis. And this was in our objection at ER 48. Every year they already give between $23 million to $27 million worth of cereal to charities. There's no indication that this $5.5 million is going to be on top of what they already do. There's no indication that they're parting with anything they didn't already budget for. Additionally, they have given $7.7 and $9.3 million in cash to charity every year. There's no indication. I feel like that's a bad thing. No, but my point is they're not parting with anything they didn't already plan to part with at all. They're not saying we're still going to give out $10 million, but because of the settlement, now we're going to give an extra $2.75 million. And there's no indication that that's what's happening. To summarize what you're saying is the settlement allows that to be included in what they would have done already. Exactly. What's the big deal? So my point is the only thing Kellogg's is really parting with are the attorney's fees. And that really causes one to wonder if there was an abuse of discretion here, if the settlement is fair and adequate. And I contend that it's not. We can move on to the fees. And as we all know from Bluetooth, the bottom line is the fees ought to be reasonable. And we look at a 10% take rate on a claims-made settlement, that leaves the amount of cash that will go to the class members at $275,000, which is about one-tenth of what the attorneys are taking. Again, I suggest that may be an abuse of discretion. Most importantly, the court, during the fairness hearing, asked class counsel, isn't $2 million a little high? Because $2 million constitutes a 4.3 multiplier, which is a little outside of normal range. It may be inappropriate with an exceptional result. And this result doesn't appear exceptional. And counsel's answer was? He decided it was an exceptional result in that way. It was within the range of multipliers approved within this circuit. Well, there's a bit of confusion. I read $2.4 million some places and $2 million other places. I'm not sure what it was. $2 million, I think. At least $2 million. Wasn't it up to $2 million, but then they asked for the full $2 million? They're requesting $2 million, yes. $2 million was approved in the order. That constitutes, if you break that out, an hourly rate of $2,100 an hour. And that doesn't represent a market rate in any market in this country, as far as I can tell. Class counsel admitted very little work was done on this case. And that's ER 10. Very little work. There wasn't even an answer filed. There was no discovery. There was no dispositive motions. And yet they're requesting a 4.3 multiplier. This thing settled after the complaint was filed. I'm not sure that justifies a 4.3 multiplier. When you look at the Supreme Court's language in Purdue, the hourly rate is supposed to represent the risk already. In this case, what was the risk? Having an answer filed? No, but that's not atypical in class action cases. Many of them are settled before an answer is filed. I'm not sure an answer being filed here would have added much to the liability analysis, do you think? My only position is the Supreme Court cautioned against a multiplier unless there was a truly exceptional result. And it doesn't look like this is it, justifying such a high multiplier. What would be truly interesting, if we're going to look at whether the settlement is fair, why is $2.75 million and $5.5 million a fair result? I think the answer would be looking at perhaps a burst in sales after this campaign came out, and a percentage or disgorgement of that unjustly enriched profit. We don't have that information because discovery never started. And so we're really left to think, why is this figure reasonable? We really don't know. We're just given a figure, give us a 4.3 multiplier, and we'll go away. I think we have your argument at hand. Why don't you save your time for rebuttal. Okay, thank you. And we'll hear from you. May it please the Court. Timothy Blood for the Appalese plaintiffs and the plaintiff class. This is obviously an abusive discretion case. The arguments that were made here, some of which were not made at the trial court, some of which were not made on appeal, but may have been made at the trial court, and some of which have never been made before. All of these issues have been discussed by the – and all of the relevant issues that were brought up were properly brought up in the district court. And the district court exercised its discretion in approving the settlement. Where does the 5.5 million come from? Kellogg is required to give up – to give $5.5 million worth, whatever that means, of cereal to these adult charities. Where does that 5.5 million come from? What does it mean? First of all, there has been no selection of a Cypre recipient. You know what? I know that. That's not what I asked you. No, I understand. So there are no adult charities, but the 5.5 million, and we did discuss this at the trial court level, and Kellogg – Where does it come from? What does $5.5 million mean? It's a negotiated figure. But is it – how do you calculate that then? Is it the cost of the cereal? They have to give $5.5 million in cost. Is it a wholesale cost? Is it a retail cost? Or is it just made up? How do you calculate that? Oh, no, I'm sorry. I misunderstood your question. It is the – it is Kellogg's wholesale cost. Wholesale cost? Where does it say that? And that is in both the trial court briefs submitted by both the plaintiffs and Kellogg, and it's also mentioned in plaintiffs – the citations to the record are in plaintiffs' briefs. I'm happy to find those. It's not part of the settlement. It's in your brief. That's correct. The settlement was simply silent on the issue, and then when the issue was raised, we said, well, of course it's the wholesale cost. That is – that's the number that the parties had always – Wouldn't that have to be in the settlement? How is it binding if it's in the briefs? Judicial admission or something like that? It would be a judicial admission. It would be – both parties are bound by the statements they make to the district court, sir. Kellogg already gives a lot of cereal to charities. Is that right? That is right. That's correct. Is there anything that prohibits Kellogg from including within the amount that it already gives, the 5.5? And Kellogg has also said that that was in addition to the amount – And where does it say that? In Kellogg's briefs. That's something – Not in the settlement either. That's right. The settlement – This gets murkier and murkier by the minute. Well, I'm not so sure it does. If they state it on the record, they're going to be bound by it. Well, I'm not sure that's entirely true in the sense of – let's say that the objectors say, we've discovered you aren't giving it. We've discovered that you're deducting it as a cost of business and you budgeted for it, and you're not – in terms of the agreement. And they say, well, look, the agreement doesn't say that. The judgment doesn't say that. How do you enforce it? I think the easiest remedy, because this is a – we're in the middle of settlement implementation, is simply at the time that the application is made for a SIPRE contribution to a charity, we have to go back to court and get an order. That's simply included in the order. And the statements that the parties made during the fairness hearing can simply be made part of the SIPRE order. Let's adjourn. Let's run back to the district court and cover that. Is that the story? If it's a concern – Or who would you like us to affirm what the district court did without knowing exactly what the district court is going to do? The court could affirm with directions to the district court to include that in the order regarding SIPRE recipients. Now, who are the SIPRE recipients? Who are the people who are going to – who receive this? Well, the only detail about who those people are are what is in the settlement agreement. And the reason for that is because there is a time delay between identifying who the people are and when the settlement will actually be implemented. But you don't identify the essence of the charities and relate that essence to what we talk about in our cases, Nashen and the six Mexican workers. I mean, it could end up having no nexus, no tie at all to what this lawsuit is dealing about. I disagree with that, Your Honor, because the settlement agreement requires, and this is at the excerpts of record at page 74 – Yeah, I'm looking at it. Beginning 30 days after the effective date? That the SIPRE recipient has to comply with the requirements of SIPRE recipients. It has to fit within that existing body of law of who could receive a SIPRE recipient. They have to meet those requirements. And the district court can determine – Wouldn't that be a 501c3 or something or what? Typically, it's a 501c3-type organization. We chose food because these are – the allegation in the complaint is that there were misrepresentations about the nutritional value of food made to children's cereal, and so we picked food products to be donated. Shouldn't you and couldn't you have described the charities more precisely to tie it with the gravamen of what the lawsuit was all about in the first place? And it's just – it's wide open. And I know you have to go back and get approval, but there's nothing in here that restricts these kinds of recipients. But I think it's inherently restricting. Whoever it is has to comply with SIPRE requirements. So why can't you do it now? Well, today – What you're asking is, well, we've decided to settle this case. Can we settle it? Court of Appeals, please bless our settlement. We won't tell you what it is until after we're finished. No, I don't think that's true. We have to comply with – there's a very practical aspect to this. Well, the practical aspect is nothing is going to change that much with these SIPRE recipients. Nothing. Right. But we can't pick just anything. We have to pick organizations. Fine. But is the organization going to change the amount of time that it takes you to appeal a case? Is that what you were worried about? Maybe. And we don't know. Maybe. Which organizations do you have in mind? Name a few. That I believe would be appropriate is Feeding America. We haven't discussed it with defendants because we're not at that point yet. Feeding America is a nationwide organization. It distributes food all over the country, so it would be appropriate in this instance on a nationwide basis. How long have they been in operation? Decades. They're the oldest – Are they going to change between now and, you know, eight weeks from now or eight months from now? It would be easier to say Feed America, and if they fall out, then we'll go back and get somebody else under SIPRE. But just leave it wide open where we don't even have a description that ties it to the harm that we're dealing with. But it is because it has to comply with existing SIPRE law. It has to comply with six Mexican workers. It has to – Right. And I don't see how you do that, honestly, in this case. How does feeding the indigent have anything to do with school kids and their attentiveness? Well – All you're saying is – Why? Well, no. You're telling me you have an advertising injury that has no nexus to the indigent. That's not true. More than half – these are claims about nutritional benefits of food products. To kids. More than half of the children – more than half of the people that fall below the poverty rate in the United States are children. Now, that's not in the record today. It will be in the record in connection with the SIPRE recipients, but that's a simple fact. And so by donating these food products to charities like Feeding America, then those types of charities will be able to fulfill one of the underlying purposes of the lawsuit. How many claimants have there been? That's a good question. There have been – That's why I asked that. Right. The defendant said there would be at most – we can't even imagine getting the $275,000 worth. Claims period is closed. Somebody knows how many claimants there are. Yeah, absolutely. And there have been over $800,000 worth of claims submitted. So according to – I think the question was claimants. How many claimants? I think around 50-some-thousand. I knew the dollar amount. I apologize. I think that works out to about 50-some-thousand claimants. So there's a bunch more money that's going to go to the SIPRE pot. Yes. And that – and remember, with this settlement, there's two different SIPRE pots. There's the product donations, and then there's also leftover cash contributions. With those types of organizations, you know, organizations that would receive cash would be something like organizations that further consumer protection statutes. And that makes sense also within the context of this type of lawsuit. You know, one of the things we're supposed to watch out for is that I'm not accusing anybody of anything. It's selling out the class in order to get big attorney's fees, and that seems to be one of the claims here. What's your answer to that? Very little work was done. Lots of money was negotiated to get it out of town, and it's a drop compared to what Kellogg's total net worth is. And here's the problem. There was quite a bit of work done, and that is in the record. It's described what work was done. Here was the issue with this case. The problem with this case is many wheats have been sold for a very long time. In comes an advertising campaign that Kellogg's has. It's a false and misleading advertising campaign. There's no question about that. However, the number of product that has been sold remains relatively stable. That's how it is in this industry, regardless of what the advertising campaign is, because the advertising campaign in these types of established markets are to maintain market share. They're not really they would like them to increase market share, but that's not really the purpose. Is that in the file? In the record, how do we know that? Well, it's one of the arguments that the defendants made, and it's one of the problems with these cases. So the last place the plaintiff wants to be, and this is litigation strategy, the last place that the plaintiffs want to be is in court running and trying to get a class cert order because that is our greatest hurdle in the case. Is it in the district court record? I'm not going to say that because if the settlement's not approved or there's other cases down the line, I don't want that to hurt my position later on in a case that is otherwise meritorious that ends up being tossed out because of class certification and not because of the merits of the case. And so I think just the opposite is true. The fact that we were smart enough to not push this case in the trial court. Litigation occurs outside of the courtroom. The fact that we got all the evidence that we needed, and that's all in the record. The fact that we negotiated this heavily, the fact that we pushed and we pushed and we pushed, and we thought this is an outstanding result for this kind of case, a case where we had a very, very high chance of losing class certification. And I think this is an excellent result. And one of the things that is not really challenged is the overall result. We gave out a reasonable or we gave out as we have more cash than there are claimants. It's a simple fact. It's a reality in these types of cases. And so what do you do with the rest? Do you say, forget about the $5.5 million because it's product donation. We'll just get rid of that. That does not serve the purposes of the UCL, the unfair competition law, or the CLRA. The purpose of those statutes is primarily disgorgement and deterrence. And these remedies, this is a side case settlement in large part because they serve the purposes of those underlying state laws under which we sued. And there's nothing to prevent it from being included in what Kellogg already gives away? Except for the statements that Kellogg has made. And personally, if this Court believes that it should be remanded with instructions to make sure that the Cy Cray order takes that into consideration, I would be thrilled. That would be great. I have absolutely no problem with that. You know, the hours and hourly rates were not challenged by counsel down below. Other than, gee, it wasn't, we weren't in court a lot. But I think that's a benefit. That's a good thing here that we weren't in court a lot from my perspective. I think this is an outstanding settlement. And frankly, it's the kind of settlement that the Court should embrace. I am not saying, I am not saying that we shouldn't be diligent about Cy Cray relief. I fully agree that we should because there have been abuses. But that will be dealt with at the trial court at the appropriate time when we know when we're selecting them. Why not Feeding America? I don't know if defendants will agree to that. But when we do do that, objectors will be served with the papers. And if they don't like the Cy Cray recipient, if they don't like what the district court did in reaching that decision, then we'll come back up here. And you'll just dismiss them as professional objectors, don't pay any attention to them. And there's a, well, I'm not going to. I mean, there's a long history, and this is also in the record, of what this particular group does. And they tend not to be interested in the properness of a Cy Cray recipient. And Judge Talke has a question. I'll let her go. I have a little difficulty. I'll tell you nothing but the truth. If, in fact, and I haven't worked it out, it ends up at $2,100 an hour for your time, that's a little steep under any circumstances. I come from New York, which is the high-price area. We have all the, you know, no one, no one has guts enough to even come close to that. In this type of settlement, the case law is very clear. The Ninth Circuit is very clear. Either lodestar or multiplier, the court decided it on lodestar, or on multiplier, or I'm sorry, percentage of the benefit, and then conducted a lodestar crosscheck. And that lodestar, the 4.3 lodestar, at the time of the fairness hearing, is within the range of reasonableness. And we've cited the cases that say that's perfectly acceptable. Keep in mind also, we've now gone through an appeal, so it's not a 4.3 multiplier. It's something lower than that. And we haven't gone back, and we haven't finished implementing the settlement. We will also do that. We haven't finished selecting side prey recipients and presenting those suggestions to the court either. And we may face another appeal. And our fee doesn't increase over that, and I'm not complaining about that, but that is the deal. You're locked in. That's the fee no matter what happens. Yes. So every moment that goes by that I'm working on the case, that 4.3 multiplier decreases. And even so, if it was locked in at 4.3, that is within what courts have approved in the past. And I'm not sure you want to hear it, but I can talk about the economics of this type of practice and why, when you do have a case where you can make money, you need to make money, because there are plenty of cases where you're underwater in the case, and these cases generally are exceedingly expensive to finance. So there is an ongoing operation that has to be financed, and the case law approves this type of arrangement and always has, and it's well within the four corners of the law. Any further questions? Thank you. Thank you. I believe, go ahead. Good morning, Your Honors. May it please the Court, Kenneth Lee on behalf of the appellee, the Kellogg Company. I'll be very brief, but I do want to address a few points. The first is I want to dispel the objector's characterization of this case as a case of fraud. This is a quote-unquote slam-dunk case that required minimal effort and that seemed to imply that Kellogg did not have any basis to defend itself in this lawsuit. Kellogg strongly believed that it actually did have very strong defenses, both on a substantive level as well as on a procedural level. You mean the advertising was true? We believe we did have scientific substantiation. You believe you did have scientific substantiation. You know, we've been, have you ever heard of Dalbert? I mean, everybody, I've yet to see anything that can't come up with scientific verification. I mean, I've got to tell you, it sounds like hogwash to me. Judge Schwartz, I understand your point, but that was in part the reason why we made a business decision to settle because we realized it would be a very costly battle of the experts. And, you know, I know $2,100 sounds a lot, but experts charge a lot, too, and we felt that it would be very costly. Three years from now, you can go back to that. Your Honor, I can't speak for what will happen three years from now, Your Honor, but we did believe we had very strong defenses, and in part also. How did you push for a three-year ban? Again, Your Honor, I believe it was negotiated with the parties, and, you know, it was an arm's-length negotiation. We used a very experienced jams mediator to settle this lawsuit. And one of the also the stronger arguments we had was on class certification issues, especially in light of very favorable case law that's come down recently from the Ninth Circuit as well as the Supreme Court. Yes. Yeah, sure. And I think Mr. Blood hinted at this. One of our strongest arguments here was frosted mini-wheats have been purchased for decades. People have bought them because they grew up with it, they like the taste, and the fact that it had some banner. They were told it would make their kids smarter. We don't believe, you know, in terms of those banners, it would affect most consumers. We believe, you know, most consumers buy them, and evidence would have shown that they buy them because they ate them as children, they like the taste, it's priced well, the brand loyalty. So we believe we have strong arguments. So they ignore the advertising? They just eat them because they like them? I think a large portion of public safety. Better call your ad agency then. Yeah. You'd save them a lot of money, yeah. Going back to the purpose of the charity, I have a little bit of a disconnect under our case law with the use of just saying we're going to give this in-kind donation to indigent organizations that support the indigent, when really the suit had nothing to do with that. What's your response to that? Your Honor, the settlement agreement said the parties will confer and the court will approve of this. And here the lawsuit here was over nutritional value of cereals. And part of the reason why Cyprea is an appropriate mechanism here is because cereal, across the many reeds, are eaten by the entire gamut of people here now. Yeah, but Cyprea is not given to Cambodian refugees. I mean, there's limitations, as we've said in our cases. Yes, Your Honor. And this just seems so wide open, indigent. How do indigents tie into the gravamen of the dispute? I think that is one of the problems when you have a mass consumer food product like cereal that's eaten by the rich, the poor, every ethnic group, every region of the country. So you will never have an exact, precise, direct nexus. I don't think that's a requirement either. But we do believe there's a substantial overlap because people who will benefit in the Cyprea, the charity organizations, they probably during their times have bought cereal-like products. I grant you all that, but the suit was about representations made to parents of kids so they're going to be smarter. It didn't say the indigent anywhere in there. That's my question. And I'm sure you could solve it. I'm just saying what the district court approved only requires, restricts it to the charities that support the poor, which is a noble thing. But it seems to me pretty disconnected from the suit about advertising injury, the fact that cereal helps in cognitive processing in kids. I'm just struggling. Both of you say, well, everybody eats cereal. I just want to know as best you can where the nexus is to the complaint. We view this lawsuit as a statement about the nutritional value of the cereal. And when you look at, if you see the gravamen of the case as the, they were disputing the veracity of the statement about the nutritional value of the cereal, we are providing, we select certain cereals that we believe are highly nutritious, and we are giving it to charities that will serve and provide the cereal that are nutritious to people who almost certainly have purchased these type of cereals in the past. Have purchased them? Be indigent? Not too many of them go out and purchase mini Frosted Flakes or whatever the heck it is. They go and they buy the round things, not Cheerios. They're round things, and they're in the local brand. They don't buy Kellogg's. I don't think we've specified what type of charities will receive this. It says so right in the complaint, it says indigent. And the complaint says, here's the misrepresentation. It's clinically shown to improve kids' attentiveness by 20 percent. Start your day off right with your kids. Kids get an energy boost. Keep them full and focused. I'm just reading from the complaint. Attentiveness put to the test of the daily wheat. Represent all this advertising. Consumption of product to prove kids' attentiveness by 20 percent. This is eating a bowl of product that's not clinically shown to prove kids' attentiveness. I mean, I don't mean to sound frustrated, but our case law is pretty clear. It has to have some nexus to the complaint. You viewed it as broader. I just don't see the complaint having any nexus with the charities you've designated. Judge Thomas, I think the proper way to look at this, at least in our view, is that this complaint was about nutritional value. Excuse me, statements about the nutritional value of cereal. We are providing nutritious cereal to charities that will serve children because it will be approved by the court, and these children will benefit from these nutritious cereals. But there's no restriction in that the appeal here is that there's a disconnect. The approval of the district court says it's to charities that involved giving food or any kind of contributions to the indigent. What check is there on that? I think the check will be the district court judge. The district court judge that is very familiar with the case law, that is familiar with what the Ninth Circuit has said, and the approval of the charities will have to be approved by the court. Why can't you do that in a settlement? I mean, I keep apologizing for bringing that up, but what's this mystery about there's some unknown future out there where all these things are going to change? What's the mystery? I think this was part of the negotiations. We perhaps thought this was a better solution in terms of having actually a judge approve of it. Well, it turns out that was wrong, wasn't it? Why don't you just take a package of these frosted mini-wheats, stick in at a coupon for 50 cents off the next package of frosted mini-wheats? That way the people who buy it now, according to you, they're the ones who bought it back then. And why can't you do that? Judge Zeffi, that perhaps could have been a solution, but, you know, I think under the standard review. But the difference is if you do it that way, accounting-wise, you have to take it off, right? Whereas if you do it the way you're proposing, oh, we can stick it in with our charitable giving, right? Judge Zeffi, I think, again, I would just emphasize that. The facts benefit that way that you wouldn't get with the coupons. I would emphasize, Judge Zeffi, that under the standard review, it's an abuse of discretion and doesn't have to be the perfect, doesn't have to be, I think, the language is a snazzier. Right. I agree with you on that. Go ahead. Sorry. It's got to agree with the decisions of the Ninth Circuit. And does it? No. I mean, the real problem, from my perspective, is that the Supreme Court, and to a large extent Congress, has really emphasized that we have to take a close examination of settlements in class action cases. And so this may seem picky-uned that we would ask you about the controls on the distribution or the purpose of the charities, but that's what we're supposed to do. And the district courts, you know, you have an excellent district court judge, no question about it, but it's a very short document. It doesn't by in comparison with other class actions, and we see a lot of them, it's pretty short. It's pretty thin. The settlement's pretty thin. I'm just giving you my reaction to it. Judge Thomas, if I may address that point. I would cite the NREA Mexico money transfer litigation. In that case, the complaint was that the defendant had failed to disclose the exchange rate for foreign currencies. I think a lot of the customers were Mexican-Americans or Mexicans who were sending their money back to Mexico. And the side prey in that case was they would donate money to reputable Mexican-American organizations. And the court said, well, that's close enough. It's very difficult to figure out who those people were who exchanged the rates. I think part of what the court said was some of them may never identify themselves because they may not have been here legally. And they said, well, it's close enough. We're going to give it to a Mexican-American group that will provide benefit to Mexican-Americans. You know, I'm sure there could have been Norwegians who used that, and they wouldn't get any benefit to transfer money to Europe. But the court said that's close enough. We realize how difficult it is to identify the members here, and that's fine. Similarly, I think in the NRA Toys R Us antitrust litigation case, that case was about anti-competitive behavior that inflated the price of toys. And, again, part of it was it's hard to identify who got hurt here, how much more they paid, and they said we're going to give money, we're going to give toys to charities who give, who will then be poor children who will get the toys. It's not clear if the poor children themselves were the only ones who were supposedly affected by the inflated price, but the court says, well, in these cases, it's very difficult to identify the class members. There's some kind of nexus. There's some overlap. We don't require, this isn't a strict scrutiny type analysis where it has to be absolutely narrowly tailored. Here there is some connection. And I think, Your Honor, there is some connection here. This is about nutritional value. We provide nutritious cereals that will benefit children. And undoubtedly, probably their families did buy cereals. Maybe not in the past six months, but maybe when they were in a better financial situation two years ago, a year ago, they probably did buy cereals. And, therefore, there is some nexus, sufficient nexus here. And, again, the safety valve here is that the district court judge who has overseen this case will be the ultimate arbiter of this. Once again, how do we know that you're not going to be able to include this in what you would otherwise give, and therefore not feel any lash from it? Judge Schwartz, I think Kellogg has represented that it will be in addition to its usual donations of. . . How do you measure the usual donations? I mean, that probably fluctuates. It may, Your Honor, but I think its representation. . . How does that work? How would we know that there's a $5.5 million in what you donated that's over and above what you would have otherwise donated? I think it's, you know, Kellogg will make the representation that it will earmark $5.5 million worth of cereals and donate it to the Cypre and. . . And how do we know the other donations that you make wouldn't go down by $5.5 million? Your Honor, I mean, there's. . . I think it is representation of Kellogg to the court that it will do so. Right. No, I mean, we take what you said in good faith, but, you know, when we talk about settlements, we talk about legally enforceable documents here. Right. And you have a judgment that approves a settlement, and the settlement doesn't include any of those restrictions. So how could anyone enforce that provision? We accept your good faith, but, I mean, if somebody were suspicious, how could they enforce it? Your Honor, again, I think this may come to. . . I mean, no good deed going unpunished here. I know Kellogg has donated quite a bit in the past, and I think it's representation that this will be in addition to it and to its usual. . . You wouldn't have any objection to having a restriction on a settlement agreement that provided that, would you? We can make the statement. I guess the one question that I'm just thinking on top of my head is, to a certain extent, if we gave a lot of money to a certain charity, a certain cause, and there's some situation with that particular charity, you know, numbers may fluctuate a bit. So this is, again, I'm just thinking on top of my head. But, you know, there may be some issues along those lines. But, again, I think, you know. . . I don't understand what you just said. I don't either. It seems to me you're asking us to trust the same people who told everybody their kids would get smarter if they ate frosted mini-wheats. I think there are studies that show that, but I actually don't. . . I won't get into the merits of that. But there are studies that back that up. But, Your Honor, again, all I can do, I guess, is, you know, make that representation to you that it will be in addition to its previous charitable givings.  Thank you, Your Honor. Thank you. Did you have frosted mini-wheats this morning? Excuse me, Your Honor? Did you have frosted mini-wheats this morning? Maybe I should have, Your Honor. I would have more attitude. Your attentiveness seems high. Mr. Rock. Yes. Do you have anything to add, or do you . . . A couple words, Your Honor. I couldn't disagree more strongly about this case being about nutritional value. That's nowhere in the complaint. It's about false advertising, the CLRA, the UCL, just like Mr. Blood mentioned. And that's why it has to go to children who need to eat breakfast. And as a parent with young children, they would rather have the sugar cereals in school. It seems to me . . . And the good stuff. They don't want the muselix and the fiber. Give some cereal to school children in inner cities who don't get breakfast. That's the whole point. They have all these breakfast programs that need this stuff. I mean, why don't they designate . . . Don't give them stuff they're not going to eat. You're not going to get one kid picking up that All-Brand. Give them frosted mini-wheats. Anyway, so that's my response to that. To their point, why can't you make that objection when you come down to distributing the money? With response to . . . Judge Gonzales is a . . . Chief Judge Gonzales is a . . . I'd like to address Mr. Blood's comment about the aims of UCL class actions, of disgorgement and deterrence. I don't think this meant either one of them. As the Court already knows, we're not sure what they're disgorging except 2 million in attorney's fees. We're not assured of anything in this settlement. It's unreasonable. It's unfair on its face because there are all these questions out there. With respect to the percentage of the common fund, we've already found out that they're charging the 5.5 million is the wholesale. And we disclosed in our reply brief that that's a 40% markup. So they're giving away . . . They're only giving away 60% of that 5.5 million, which is about 3 million. So now Kellogg's is giving away 5.75 million. And 2 million is almost 30% of that. So I think this fails under the percentage of the common fund as well. Can I ask you a couple of questions that are none of my business? You've been dismissed continuously, you, your side, as a professional objector. That's something that's bad. Who are you, and what's your point in this, and who pays you, and all the rest of that stuff? I work for this old practitioner, Darrell Palmer, and I analyze settlements, and I see if there's anything wrong with them. So you don't have a client? Yes, we have a client. Who's the client? Ms. Berg. Okay, and who's that? She is a friend of Mr. Palmer's. Is she kind of a straw client? No, Your Honor, no. We know Ms. Berg. I don't. Mr. Palmer knows Ms. Berg. So she just doesn't like class actions. It's not that she wants kids to be eating good food.  She pays you to represent her? Oh, no. I don't know. Who pays you? Mr. Palmer pays me. Who pays him? I don't know. That's not really my area I'm retaining. Okay, it's none of my business, but they keep saying, you're a professional like you're a terrorist. I'm just sort of curious who you are and why you're here. How old are your kids? 12, 14, and 15. What do you feed them for breakfast? I like the Fruity Pebbles, and my son likes the Cookie Crisp, and we still like Apple Jacks. Okay. And I like Frosted Mini-Wheats. Thank you for putting up with my questions. You've got a consumer over there. Thank you very much. The case is to be submitted and will be on recess.
judges: Duffy, Trott, Thomas